Mr. Justice MILLER,
dissenting:
In the opinions which have just been delivered, I have not been able to concur. But I should have contented myself with the mere expression of dissent, if it were not that • the principle on which the court rests its decision is one, not only essentially wrong, in my judgment, but one which, if steadily adhered to in future, may lead to consequences of the most serious character. In adopting that principle, this court has, as I shall attempt to show, gone in the present case a step in advance of anything heretofore ruled by it on the subject, and has taken a position which must bring it into direct and unseemly, conflict with the judiciary of the States. Under these circumstances, I do not feel at liberty to decline placing upon the records of the court the reasons which have forced me, however reluctantly, to a conclusion different from that of the other members of the court.
The action in the present case is on bonds of the city of Dubuque, given in payment of certain shares of the capital stock of a railroad company, whose road runs from said city westward. The court below held, that the bonds were void for want of authority in the city to subscribe and pay for such stock. It is admitted that the legislature had, as to one set of bonds, passed an act intended to confer such authority on the city, and it is claimed that it had done so as to all the bonds. I do not propose to discuss this latter question.
It is said, in support of the judgment of the court below, that all such grants of power by the legislature of Iowa to any municipal corporation is in conflict with the Constitution of the State, and therefore void. In support of this view of the subject, the cases of Stokes v. Scott County,* and The State of Iowa, ex relatione, v. The County of Wapello,† are relied on.
*208 In tbe last-mentioned ease, the County of "Wapello had agreed to take stock in a company whose road passed through the county, but had afterwards refused to issue the bonds which had been voted by the majority of the legal voters. The relator prayed a writ of mandamus to compel the officers of the county to issue the bonds. One question raised in the discussion was, whether section 114 of the code of Iowa, of 1851, was intended to authorize the counties of the State to take stock in railroad companies ? And another was, that conceding such to be the fair construction of that section of the code, was it constitutional ?
The Supreme Court, in a very elaborate and well-reasoned opinion, held that there was no constitutional power in the legislature to confer such authority on the counties, or on any municipal corporation. This decision was made in a case where the question fairly arose, and where it was necessary and proper that the court should decide it. It was decided by a full bench, and with unanimity. It was decided by the court of highest resort in that State, to which is confided, according to all the authorities, the right to construe the Constitution of the State, and whose decision is binding on all other courts which may have occasion to consider the same question, until it is reversed or modified by the same court. It has been followed in that court by several other decisions to the same point, not yet reported. It is the law administered by all the inferior judicial tribunals in the State, who are bound by it beyond all question. I apprehend that none of my brethren who concur in the opinion just de livered, would go so far as to say that the inferior State courts would have a right to disregard the decision of their own appellate court, and give judgment that the bonds were valid. Such a course would be as useless, as it would be destructive of all judicial subordination.
Yet this is in substance what the majority of the court have decided.
They have said to the Federal court sitting in Iowa, “You shall disregard this decision of the highest court of the State on this question. Although you are sitting in the State of *209 Iowa, and administering-her laws, and.constvuing her constitution, you shall not follow the latest, though it be the soundest, exposition of its constitution by the Supreme Court of that State, but you shall decide directly to the contrary; and where that court has said that a statute is unconstitutional, you shall say that it is constitutional. When it says bonds are void, issued in that State, because they violate its constitution, you shall say they are valid, because they do not violate the constitution.”
Thus we are to have two courts, sitting within the same jurisdiction, deciding upon the same rights, arising out of the same statute, yet always arriving at opposite results, witb_ru> conpnuaa_arbiteK-of-their differences.. There is no hope of avoiding this, if this court adheres to its ruling. For there is in this court no power, in this class of cases, to issue its writ of error to the State court, and thus compel a uniformity of construction, because it is not pretended that either the statute of Iowa, or its constitution, or the decision of its courts thereon, are in conflict with the Constitution of the United States, or any law or treaty made under it.
Is it supposed for a moment that this treatment of its decision, accompanied by language as unsuited to the dispassionate dignity of this court, as it is disrespectful to anothei. court of at least concurrent jurisdiction over the matter in question, will induce the Supreme Court of Iowa to conform' its rulings to suit our dictation, in a matter which the very frame and organization of our Government places entirely under its control ? On the contrary, such a course, pursued by this court, is well calculated to make that court not only adhere to its own opinion with more tenacity, but also to examine if the law does not afi'ord them the means, in all cases, of enforcing their own construction of their own constitution, and their own statutes, within the limits of their own jurisdiction. What this may lead to it is not possible now to foresee, nor do I wish to point out the field of judicial conflicts, which may never occur, but which if they shall occur, will weigh heavily on that court which should have yielded to the other, but did not.
*210 The general principle is not controverted by the majority, that to the highest courts of the State belongs the right to construe its statutes and its constitution, except where they may conflict with the Constitution of the United States, or some statute or treaty made under it. Nor is it denied that when such a construction has been given by the State court, that this court is bound to follow it. The cases on this subject are numerous, and the principle is as well settled, and is as necessary to the harmonious working of our complex system of government, as the correlative proposition that to this court belongs the right to expound conclusively, for all other courts, the Constitution and laws of the Federal Government.*
But while admitting the general principle thus laid down, the court says it is inapplicable to the present case, because there have been conflicting decisions on this very point by the Supreme Court of Iowa, and that as thq bonds issued while the decisions of that court holding such instruments to be constitutional were unreversed, that this construction of the constitution must now govern this court instead of the later one. The moral force of this proposition is unquestionably very great. And I think, taken in connection with some fancied duty of this court to enforce contracts, over and beyond that appertaining to other courts, has given the majority a leaning towards the adoption of a rule, which in my opinion cannot be sustained either on principle or authority.
The only special charge which this court has over contracts, beyond any other court, is to declare judicially whether the statute of a State impairs their obligation. No such question arises here, for the plaintiff' claims under and by virtue of the statute which is here the subject of discussion. Neither is there any question of the obligation of contracts, or the right to enforce them. The question goes behind that. We are called upon, not to. construe a contract, nor to determine how one shall be enforced, but to decide whether there ever *211 was a contract made in the case. To .assume that there was a contract, which contract is about to bo violated by the decisions of the State court of Iowa, is to beg the very question in dispute. In deciding this question the court is called upon, as the court in Iowa was, to construe the constitution of the State. It is a grave error to suppose that this court' must, or should, determine this upon any principle which would not be equally binding on the courts of Iowa, or that the decision should depend upon the fact that certain parties had purchased bonds which were supposed to be valid contracts, when they really were not.
The Supreme Court of Iowa is not the first or the only court which has changed its rulings on questions as important as the one now presented. I understand the doctrine' to be in such cases, not that the law is changed, but that it was always the same as expounded by the later decision, and that the former decision was not, and never had been, the law, and is overruled for that very reason. The decision of this court contravenes this principle, and holds that the decision of the court makes the law, and m fact, that the same statute or constitution means one thing in 1853, and another^ thing in 1859. For it is impliedly conceded, that if these bonds had been issued since the more recent decision of the Iowa court, this court would not hold them valid.
Not only is the decision of the court, as I think, thus unsound in principle, but it appears to me to be in conflict with its former decisions on this point, as I shall now attempt to show.
In the case of Shelby v. Guy,* a question arose on the construction of the statute of limitations of Tennessee. It was an old English statute, adopted by Tennessee from North Carolina, and which had in many other States received a uniform construction. It was stated on the argument, however, that the highest court of Tennessee had given a different construction to it, although the opinion could not then be produced. The court said, that out of a desire to follow *212 the courts of the State in the construction of their own sta> tute, it would not then decide that question, but as the case had to be reversed on other points, it would send it back, leaving that question undecided.
In the case of The United States v. Morrison,* the question was, whether a judgment in the State of Virginia was, under the circumstances of that ease, a lien on the real estate of the judgment debtor. In the Circuit Court this had been ruled in the negative, I presume by Chief Justice Marshall, and a writ of error was prosecuted to this court. Between the time of the decision in the Circuit Court and the hearing in this court, the Court of Appeals of Virginia had decided, in a case precisely similar, that the judgment was a lien. This court, by Chief Justice Marshall, said it would follow the recent decision of the Court of Appeals without examination, although it required the reversal of a judgment in the Circuit Court rendered before that decision was made.
The case of Green v. Neal,† is almost parallel with the one now under consideration, but stronger in the circumstances under which the court followed the later decision of the State courts in the construction of their own statute. It is stronger in this, that the court there overruled two former decisions of its own, based upon former decisions of the State court of Tennessee, in order to follow a later decision of the State court, after the law had been supposed to be settled for many years. The case was one on the construction of the statute of limitations, and the Circuit Court at the trial had instructed the jury, “ that according to the present state of decisions in the Supreme Court of the United States, they could not charge that defendant’s title was made good by the statute of limitations.” The decisions here referred to were the cases of Patton v. Easton,‡ and Powell v. Harman.§
The first of these cases was argued in the February Term, 1815, by some of the ablest counsel of the day, and the opinion delivered more than a year afterwards. In that opinion *213 Chief Justice Marshall recites the long dispute about the point in North Carolina and Tennessee, and says it has at length been settled by the Supreme Court of the latter State by two recent decisions, made after the case then before it had been certified to this court, and the court follows those decisions. This is reaffirmed in the second of the above-mentioned cases.
In delivering the opinion in the case of Green v. Neal, Justice McLean says that the two decisions in Tennessee referred to by Judge Marshall were made under such circumstances that they were never considered as fully settling the point in that State, there being contrariety of opinion among the judges. The question, he says, was frequently raised before the Supreme Court of Tennessee, but was never considered as finally settled, until 1825, the first decision having been made in 1815. The opinion of Judge McLean is long, and the case is presented with his usual ability, and I will not here go into further details of it. It is sufficient to say that the court holds it to be its duty to abandon the two first cases decided in Tennessee, to overrule their own well-considered construction in the case of Patton v. Easton, and its repetition in Powell v. Green, and to follow without examination the later decision of the Supreme Court of Tennessee, which is in conflict with them all.
At the last term of this court, in the case of Leffingwell v. Warren,* my very learned associate, who has just delivered the opinion in this case, has collated the authorities on this subject, and thus on behalf of the whole court announces the result:
“ The construction given to a State statute by the highest judicial tribunal of such State, is regarded as a part of the statute, and is as binding upon the courts of the United States as the text. .... If the highest judicial tribunal of a State adopt new views as to the proper construction of such a statute, and reverse its former decision, this court will follow the latest settled adjudications.”†
*214 It is attempted, however, to distinguish the ease now before us from those just considered, by saying that the latter relate to what is rather ambiguously called a rule of property, while the former concerns a matter of contract. I must confess my inability to see any principle on which the distinction can rest. All the statutes of the States which prescribe the formalities and incidents to conveyances of real estate would, I presume, be held to be rules of property. If the deed by which a man supposes he has secured to himself and family a homestead, fails to comply in any essential particular with the statute or constitution of the State, as expounded by the most recent decision of the State court, it is held void by this court without hesitation, because it is a rule of property, and the last decision of the State court must govern, even to overturning the well-considered construction of this court. But if a gambling stockbroker of Wall Street buys at twenty-five per cent, of their par value, the bonds issued to a railroad company in Iowa, although the court of the State, in several of its most recent decisions, have decided that such bonds were issued in violation of the Constitution, this court will not follow that decision, hut resort to some former one, delivered by a divided court, because in the latter case it is not a rule of property, but a case of contract. I cannot rid myself of the conviction that the deed which conveys to a man his homestead, or other real estate, is as much a contract as the paper issued by a municipal corporation to a railroad for its worthless stock, and that a bond when good and valid is property. If bonds are not 'property, then half the wealth of the nation, now so liberally invested in the bonds of the government, both State and national, and in bonds of corporations, must be considered as having no claim to be called property. And when the construction of a constitution is brought to bear upon the questions of property or no property, contract or no contract, I can see no sound reason for any difference in the rule for determining the question.
The case of Rowan v. Runnels,* is relied on as furnishing *215 a rule for this case, and support to the opinion of the court. In that case the question was on the validity of a note given for the purchase of slaves, imported into, the State of Mississippi. It was claimed that the importation was a violation of the Constitution of the State, and the noté therefore void. In the ease of Groves v. Slaughter,* this court had previously decided that veiy point the other way. In malting that decision it had no light from the courts of Mississippi, but was called on to make a decision in a ease of the first impression. The court made a decision, with which it remained satisfied when Rowan v. Runnels came before it, and which is averred by the court to have been in conformity to the expressed sense of the legislature, and the general understanding of the people of that State. The court therefore in Rowan v. Runnels declined to change its own rulings, under such circumstances, to follow a single later and adverse decision of the Mississippi court.
In the case now before the court it is not called on to retract any decision it has ever made, or any opinion it has declared. The question is before this court for the first time, and it lacks in that particular the main ground on which the judgment of this court rested in Rowan v. Runnels. It is true that the chief justice, in delivering the opinion in that case, goes on to say, in speaking of the decision of the State courts on their own constitution and laws: “ But we ought not to give them a retroactive effect, and allow them to render invalid contracts entered into with citizens of other States, which, in the judgment of this court, were lawfully made.” I have to remark, in the first place, that this dictum was unnecessary, as the first and main ground was, that this court could not be required to overrule its own decision, when it had first occupied the ground, and when it still remained of •the opinion then declared. Secondly, that the contract in Rowan v. Runnels, was between a citizen of Mississippi, on the one part, ánd a citizen of Virginia on the other, and the language of the chief justice makes that the ground of the *216 right of this court to disregard the later decision of the State court; and in this case the contract was made between the city of Dubuque and a railroad company, both of which were corporations existing under the laws of Iowa, and citizens of that State, in the sense in which that word is used by the chief justice. And, thirdly, the qualification is used in the Runnels case that the “ contracts were, in the judgment of this court, lawfully made.” In the present case, the court rests on the former decision of the State court, declining to examine the constitutional question for itself.
The distinction between the cases is so obvious as to need no further illustration.
The remaining eases in which the subject is spoken of, may be mentioned as a series of cases brought into the Supreme Court of the United States by writ of error to the Supreme Court of Ohio, under the twenty-fifth section of the Judiciary Act. In all these cases the jurisdiction of the Supreme Court of the United States was based upon the allegation that a statute of Ohio, imposing taxes upon bank corporations, was a violation of a previous contract made by the State with them, in regard to the extent to which they should be liable to be taxed. In the argument of these cases it was urged that the very judgments of the Supreme Court of Ohio, which were then under review, being the construction placed by the courts of that State on their own statutes and constitution, should be held to govern the Supreme Court of the Union, in the exercise of its acknowledged right of revising the decision of the State court in that class of cases. It requires but a bare statement of the proposition to show that, if admitted, the jurisdiction of .the Federal Supreme Court to sit as a revisory tribunal over the State courts, in cases where the State law is supposed to impair the obligation of a contract, would be the merest sham.
It is true that in the extract, given in the opinion of the court just read, from the case of the Ohio Trust Company v. Debolt, language is used by Chief Justice Taney, susceptible ■of a wider application. But he clearly shows that there was in his mind nothing beyond the case of a writ of error to *217 the Supreme Court of a State, for he says in the midst of the sentence cited, or in the immediate context, “ The writ of error to a State court would be no protection to a contract, if we were hound to follow the judgment which the State court had given, and which the court brings up here for revision.” Besides, in the opinion thus cited, the chief justice says, in the ccmmencement of it, that he only speaks for himself and Justice Grier. The remarks cited, then, were not the opinion of the court, were outside the record, and were evidently intended to be confined to the case of a writ of error to the court of a State, where' it was insisted that the judgment sought to be revised should conclude this court.
But let us examine for a moment the earlier decisions in the State court of Iowa, on which this court rests with such entire satisfaction.
The question of the right of municipal corporations to take stock in railroad companies, came before the Supreme Court of Iowa, for the first time, at the June Term, A.D. 1853, in the case of Dubuque County v. The Dubuque and Pacific Railroad Company.* The majority of the court, Kinney J., dissenting, affirmed the judgment of the court below, and in so doing must necessarily have held that municipal corporations could take stock in railroad enterprises. The opinions of the court were by law filed with the clerk, and by him copied into a book kept for that purpose. The dissenting opinion of Judge Kinney, a very able one, is there found in its proper place, in which he says, he has never seen the opinion of the majority. No such opinion is to be found in the clerk’s office, as I have verified by a personal examination. Nor was it ever seen, until it was published five years after-wards, in the volume above referred to, by one of the judges, who had ceased to be either judge or official reporter at the time it was published. Shortly after this judgment was rendered. Judge Kinney resigned, and his place was supplied oy Judge IlaL.- The case of the State v. Bissell† then came before the court in 1854. In this case, after disposing of *218 several questions relating to the regularity of the proceedings in issuing bonds for a railroad subscription, Judge Hall, who delivered the opinion of the court, then refers to the right of the county to take stock and issue bonds for railroad purposes. He says: “ This point is not urged, and the same question having been decided at the December Term of this court in 1853, in the case of the Dubuque and Pacific Railroad Company v. Dubuque County, is-not examined. This decision is not intended to sanction or deny the legal validity of that decision, but to leave the question where that decision left it.” It is clear that if Judge Hall had concurred with the other two judges, no such language as this would have been used, but they would have settled the question by a unanimous opinion. In the case of Clapp v. Cedar County, * the question came up again in the same court, composed of new judges. The Chief Justice, "Wright, was against the power of the counties to subscribe stock, and delivered an able dissenting opinion to that purport. The other two judges, however, while in substance admitting that no such power had been conferred by law, held that they must follow the decision in the Dubuque case. Several other cases followed these, with about the same result, up to 1859, Wright always protesting, and the other judges overruling him. In 1859, in the case of Stokes v. Scott County,† which was an application to restrain the issue of bonds voted by the county, Judge Stockton said that, in a case like that, where the bonds had not passed into the hands of bond fide holders, he felt at liberty to declare them void, and concurring with Judge Wright tha+- far, they so decided; Judge Wright placing his opinion upon a want of constitutional power in the legislature. Finally, in the case of the State of Iowa, ex relatione, v. Wapello County, the court, now composed of Wright, Lowe, and Baldwin, held unanimously that the bonds were void absolutely,.because their issue was in violation of the Constitution of the State of Iowa. The opinion in that case, delivered by Judge Lowe, covers the whole ground, and after *219 an examination of all tlie previous eas.es, overrules them all, except Stokes v. Scott County. It is exhausting, able, and conclusive, and after a struggle of seven or eight years, in which this question has been always before the court, and never considered as closed, this case may now be considered as finally settling the law on that subject in the courts of Iowa. It has already been repeated in several cases not yet reported. It is the first time the question has been decided by a unanimous court. It is altogether improbable that any serious effort will ever be made to shake its force in that State; for of the nine judges who have occupied the .bench while the matter was in contest, but two have ever expressed their approbation of the doctrine of the Dubuque County case.
Comparing the course of decisions of the State courts in the present case with those upon which this court acted in Green v. Neal,* how do they stand ?
In the latter case the court of Tennessee had decided by a divided court in 1815, and that decision was repeated several times, but with contrariety of opinion among the judges, up to 1825, when the former decisions were reversed. In the cases which we have been considering from Iowa, the point was decided in 1853 by a divided court; it was repeated several times up to 1859, by a divided court, under a continuous struggle. In 1859 the majority changed to the other side, and in 1862 it became unanimous. In the Tennessee case, this court had twice committed itself to the decision first made by the courts of that State; yet it retracted and followed the later decision made ten years after. In the present case, this court, which was not committed at all, follows decisions which were never unanimous, which were struggled against and denied, and which had only six years of judicial life, in preference to the later decisions commenced four years ago, and finally receiving the full assent of the entire court.
I think I hgve sustained, by this examination of the eases, the assertion made in the commencement of this opinion, *220 that the court has, in this case, taken a step in advance of anything heretofore decided by it on this subject. That advance is in the direction of a usurpation of the right, which belongs to the State courts, to decide as a finality upon the construction of State constitutions and State statutes. This invasion is made in a case where there is no pretence that the constitution, as thus construed, is any infraction of the laws or Constitution of the United States.
The importance of the principle thus for the first time asserted by this court, opposed, as it is, to my profoundest convictions of the relative rights, duties, and comities of this court, and the State courts, will, I am persuaded, be received as a sufficient apology for placing on its record, as I now do, my protest against it.
Note.
At the same time with the preceding and principal ease, No. 80 of the term, two other cases between the same parties— one being No. 79, and the other No. 81 — were disposed of. They were thus:

 10 Iowa, 166.

 13 Id., 898.

 See Shelby v. Guy, 11 Wheaton, 301; McCluny v. Silliman, 3 Peters, 277; Van Rensselaer v. Kearney, 11 Howard, 297; Webster v. Cooper, 14 Id., 504; Elmendorf v. Taylor, 10 Wheaton, 152; The Bank v. Dudley, 2 Peters, 492.

 11 Wheaton, 361.

 4 Peters, 124.

 6 Id., 291.

 1 Wheaton, 476.

 2 Peters, 241; erroneously cited in Green v. Neal, 6 Id., 291, as Powell v. Green, lli'.r.

 2 Black, 599.

 United States v. Morrison, 4 Peters, 124; Green v. Neal, 6 Id., 291.

 5 Howard, 134.

15 Peters, 449.

 4 G. Greene, 1.

 4 Id., 328.

 5 Iowa, 15.

 10 Id., 166.

 6 Peters, 291.